IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00570-RBJ-SKC

ALPHONSO BLAKE, JR.,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

    Defendant moves for summary judgment under Federal Rule of Civil Procedure 56. Plaintiff Alphonso Blake's "one claim remaining in this case" is a Federal Tort Claims Act ("FTCA") claim alleging intentional infliction of emotional distress ("IIED") by Federal Bureau of Prisons ("Bureau") officials. ECF No. 143. This claim is based on two theories: (1) an allegedly improper "discontinuation or failure to provide medication while Plaintiff was in the ADX facility [in Florence, Colorado] in 2017" (the "Medication-Discontinuation Theory"); and (2) an allegedly improper "use of force and isolation on April 14, 2017, also at ADX" (the "Use-of-Force Theory"). *Id.* The undisputed material facts show that Defendant is entitled to summary judgment on Plaintiff's lone claim, regardless of theory.

    With respect to the Medication-Discontinuation Theory, the claim fails because Plaintiff has not identified any discontinuation of medication or failure to provide medication that occurred in 2017. Months ago, the Court limited this portion of Plaintiff's IIED claim to 2017. Nonetheless,

1

in discovery Plaintiff did not identify any discontinuations of or failures to provide medication that occurred during that timeframe. Instead, Plaintiff focused on conduct from 2015 and 2016, even though the Court has already ruled that a challenge to medication-related conduct from these years would be untimely. Without any allegedly improper conduct from 2017 to support his Medication-Discontinuation Theory, this portion of Plaintiff's claim fails.

With respect to the Use-of-Force Theory—which challenges conduct related to a calculated use of force that was carried out after Plaintiff broke a large piece of concrete from the corner of his bed and used it to break the window of his outer cell door, and then refused to comply with multiple direct orders—the claim fails for two reasons. First, the claim is barred by the FTCA's discretionary-function exception. That exception excludes from the FTCA's waiver of sovereign immunity any challenges to decisions that (i) are discretionary in nature, and (ii) require an exercise in judgment that involve policy considerations. *See* 28 U.S.C. § 2680(a). At bottom, this portion of Plaintiff's claim challenges decisions by Bureau staff to use force and restraints on Plaintiff, and to temporarily place him on a more restrictive range. But these decisions are left to the sound discretion of Bureau staff and involve important policy judgments about how to best ensure safety and security at a prison that houses the most dangerous inmates in Bureau custody.

Second, even if the discretionary-function exception did not apply, the claim would fail on the merits because Plaintiff cannot show that the challenged conduct was extreme and outrageous, as required to succeed on an IIED claim. To the contrary, the undisputed material facts show that Bureau staff acted in accordance with Bureau policy and practice and exercised sound correctional judgment in using force against Plaintiff, placing him in restraints, and temporarily housing him on a more restrictive range.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Facts relevant to the Medication-Discontinuation Theory

1. In discovery, Plaintiff identified alleged medication discontinuations or failures to provide medications that occurred in 2015 and 2016. Ex. A (April 2021 Disc. Resp.) at 2; Ex. B (May 2021 Suppl. Disc. Resp.) at 2; Ex. C (Aug. 2021 Suppl. Disc. Resp.) at 2-5.

2. Plaintiff has not identified any medication discontinuations or failures to provide medication that occurred in 2017.

### Facts relevant to the Use-of-Force Theory

*ADX inmates pose a unique and serious security risk.*

3. The ADX is the most secure prison in the federal system, and it is designed to safely house the most violent, predatory, disruptive, and escape-prone inmates in Bureau custody. Ex. D (Sapp. Decl.) ¶¶ 6-8; Ex. E (Dodge Decl.) ¶¶ 6-7.

4. Inmates at the ADX have an uncommon level of security because they pose a serious risk of violence to Bureau staff, other inmates, and the public. Ex. D ¶¶ 6-8; Ex. E ¶¶ 6-7.

*Plaintiff's history of dangerous conduct.*

5. Plaintiff was an ADX inmate from February 2011 to March 2019. Ex. D ¶ 9, n.2.

6. In April 2017, Plaintiff had a known history of defeating restraints (i.e., manipulating restraints to undermine their effectiveness) and of destroying Bureau property. Ex. E ¶ 14 at Attach. A (Lt. Stasny Memo) at 1, Attach. C (Use of Force Video 1) at 1:10-1:35; Attach. D (Disciplinary Records) at 2-4.

7. He also had a known history of assaulting correctional officers and police officers. Ex. D ¶ 24 & Attach. B (Inmate Profile); Ex. E - Attach. C at 1:25-1:35.

3

*Events leading up to the April 14, 2017 calculated use of force.*

8.      On April 12, 2017, Plaintiff submitted a handwritten note addressed to ADX Psychologist, Dr. Kimble, indicating that Plaintiff wanted to "work on things related to [his] mental illnesses." Ex. F (Kimble Decl.) ¶ 7 & Attach. A (April 12, 2017 Request for Services).

9.      Under Bureau policy, Dr. Kimble had 10 business days to process Plaintiff's non-urgent request for mental-health services. Ex. F ¶ 8 & Attach. B (ADX Institution Supplement 5310.16B, Treatment and Care of Inmates with Mental Illness (July 15, 2016)).

10.     On April 14, 2017, before Dr. Kimble had followed-up on Plaintiff's note, Plaintiff threatened to break components of his cell if Psychology did not immediately respond to his request for services. Ex. F ¶ 9 & Attach. C (April 14, 2017 Clinical Intervention Note).

11.     Although ADX Psychologists do not usually respond when inmates threaten to destroy property, Dr. Kimble decided to respond because he thought there was a possibility that his intervention would deescalate the situation. Ex. F ¶ 10 & Attach. C.

12.     When Dr. Kimble arrived at Plaintiff's cell in G Unit, he observed Plaintiff protecting his hands with knitted gloves and that the corner of his concrete bed was broken, with pieces of concrete debris on the floor. He also observed Plaintiff picking up the pieces of concrete and throwing them at his thick-paned outer cell door window. Ex. F ¶ 10 & Attach. C.

13.     Dr. Kimble attempted to speak with Plaintiff from the hallway, but Plaintiff refused to engage in meaningful dialogue and yelled something to the effect of "Get the fuck on, I do not want to talk." Ex. F ¶¶ 10-11 & Attach. C.

*The calculated use of force and the related use of restraints.*

14.     At ~2:48 PM on April 14, 2017, after Dr. Kimble's unsuccessful initial attempts to

engage with Plaintiff, a use of force team ("Team") was assembled because Plaintiff had succeeded in breaking his outer cell door window and had refused multiple staff orders. Ex. E ¶¶ 12-13, 15-16, Attach. C (Use of Force Video 1) at 00:10-1:35, Attach. E (Photographs of Cell Destruction).

15. When the Team reached Plaintiff's cell, Dr. Kimble attempted confrontation avoidance, that is, he tried to convince Plaintiff to calm down so that further confrontation would not be necessary. Ex. F ¶ 13 & Attach. D (Kimble Confrontation Avoidance Memo).

16. Dr. Kimble could not see inside of Plaintiff's cell because Plaintiff had hung something over his cell window that blocked the view. Ex. E ¶ 17 & Attach. C at 08:04-9:15.

17. Confrontation avoidance proved ineffective, with Plaintiff refusing to respond to Dr. Kimble or to submit to hand restraints. Ex. F ¶ 13 & Attach. D.

18. The Lieutenant then gave Plaintiff a final order to submit to hand restraints, but Plaintiff again refused. Ex. E ¶ 18 & Attach. C at 08:04-9:15.

19. A two-second round of oleoresin capsicum ("OC") munitions was deployed into Plaintiff's cell, followed by a 15-second waiting period. At the end of the waiting period, Plaintiff was asked to submit to hand restraints, and he refused. Ex. E ¶ 19 & Attach. C at 09:30-10:35.

20. A second two-second round of OC munitions was deployed, followed by a 15-second waiting period. At the end of the 15-second count, Plaintiff was again asked to submit to hand restraints, and this time he complied. Ex. E ¶ 20 & Attach. C at 10:35-13:10.

21. The Team restrained Plaintiff's arms behind his back using hard restraints (i.e., handcuffs that have plastic or casing in the space between the wrists). Leg restraints were also placed on Plaintiff. Ex. E ¶ 21 & Attach. C at 13:00-14:00.

22. Plaintiff was taken to a holding cell in G Unit, where his clothes were removed, he

was decontaminated with soap and water, and he was given fresh clothing. Ex. E ¶ 22 & Attach. C at 14:00-21:05.

23.     Plaintiff was then given a medical evaluation and his condition was "stable." Ex. E ¶ 23, Attach. C at 21:05-24:45, Attach. G (April 14, 2017 Clinical Encounter) at 3.

24.     After the medical evaluation, Plaintiff was taken to a final holding cell in G Unit and placed in hard ambulatory restraints. Ex. E ¶ 24, Attach. C at 24:45-33:40, Attach. A at 2.

25.     Plaintiff can be heard talking throughout the use of force procedure. At points, he can be heard yelling at the Team, including saying that "BOP stands for a Bunch of Pussies." Ex. E ¶ 25 & Attach. C at 30:50-31:20.

### *Plaintiff's temporary placement on Range 13.*

26.     After the calculated use of force, Plaintiff remained in hard ambulatory restraints (i.e., hard restraints that are placed in front of the inmate's body and connected to a waist chain) for approximately 2 hours. Ex. E ¶¶ 24, 26 & Attach. H (Use of Restraints Forms) at 1.

27.     When those restraints were removed, he was moved to Range 13. Ex. D ¶ 10 & Attach. A (Excerpt Inmate History Quarters).

28.     Range 13 is a separate housing area that is physically located within C Unit and that is comprised of four, single-occupancy cells. Ex. D ¶ 16.

29.     Range 13 is unique from other housing areas in the ADX because each cell on Range 13 has an interior camera that monitors the inmate's living space, and the range itself is designed to allow an inmate to move from his cell to other programming areas (e.g., the law library and recreation) with minimal contact with staff and other inmates. Ex. D ¶ 16.

30.     In addition, Cell 40 on Range 13 is the only fully "hardened" cell at the ADX.

6

Unlike other cells, Cell 40 has steel plate walls and ceiling, a steel bed, a steel rebar reinforced stool and desk, and a steel shelf, which are much more difficult to destroy. Ex. D ¶¶ 12, 16.

31. Because of its unique security features, Range 13 is used to house inmates who have demonstrated a need for an increased level of individualized control. Ex. D ¶ 16.

32. At approximately 5:35 PM on April 14, 2017, Plaintiff was placed in Cell 40 on Range 13. Ex. E ¶¶ 11 & Attach. A.

33. During his placement on Range 13, Plaintiff had clothing, water, food, and medication, and he also had access to a shower, a toilet, a bed, a desk, a stool, a law library, and indoor and outdoor recreation. Ex. G (Excerpt Blake Dep. Tr.) at 120-25, 170; Ex. D ¶¶ 12, 16.

34. Plaintiff was moved out of Cell 40 and off of Range 13 at 2:00 PM on Tuesday, April 18, 2017. Ex. D ¶ 13 & Attach. A.

***Bureau staff have discretion to use force and restraints.***

35. Bureau staff are authorized to use force "as a last alternative after all other reasonable efforts to resolve a situation have failed." Ex. E ¶ 28 & Attach. I (Use of Force and Application of Restraints Program Statement) at 1, § 1.

36. Within the parameters of their authority, Bureau staff must exercise discretion to determine whether a particular situation calls for force. Ex. E ¶ 29 & Attach. I at 1, § 1.

37. Several layers of Bureau staff have a role in whether a calculated use of force is approved in non-emergency situations, but the Warden makes the ultimate decision. Ex. E ¶ 30.

38. Bureau staff, exercising sound correctional judgment, will weigh a variety of factors in determining whether to pursue a calculated use of force, including: (i) the severity of the inmate's present conduct, (ii) the inmate's medical history, (iii) the inmate's disciplinary history,

7

and (iv) the availability of Bureau staff and resources. Ex. E ¶ 31.

39. Bureau staff are also authorized to "apply physical restraints necessary to gain control of an inmate who appears dangerous," and that authority includes using restraints on any inmate who is placed under control by a use of force. Ex. E ¶ 32 & Attach. I at 1, § 1, and 7, §6(e).

40. Bureau staff are permitted to use several kinds of restraints, including hard restraints and hard ambulatory restraints, and they have discretion to determine which kind of restraint is most appropriate. Ex. E ¶ 33.

41. Bureau staff consider a variety of factors in making that decision, including: (i) the severity of the conduct that led to the need for restraints; (ii) whether the inmate has defeated restraints in the past; (iii) the inmate's history of violence or assault; and (iv) whether the inmate has regained self-control following the conduct that created the need for restraints. Ex. E ¶ 33.

42. No statute, federal regulation, Bureau Program Statement, Institutional Supplement, or Operations Memorandum prohibits Bureau staff from performing a calculated use of force in response to an inmate destroying his cell and refusing direct orders, or from using hard restraints or hard ambulatory restraints on an inmate who was placed under control by a calculated use of force, demonstrated a pattern of disruptive behavior, and had a history of defeating restraints. Ex. E ¶ 34.

43. No Bureau Program Statement or Settlement Agreement relating to the treatment of inmates with mental illness proscribed Bureau officials from employing the calculated use of force procedure on April 14, 2017, in response to Plaintiff's destruction of his cell and refusal to submit to hand restraints. Ex. E ¶ 43; Ex. F ¶ 19.

***Bureau staff acted appropriately in using force and restraints on Plaintiff.***

44. Bureau staff acted appropriately and in accordance with Bureau policy and standard Bureau practices in deciding to use force against Plaintiff on April 14, 2017, and in carrying out that use of force, including placing Plaintiff in restraints. Ex. E ¶ 35.

45. The decision to use force was an exercise of sound correctional judgment and in accordance with Bureau policy because confrontation avoidance had proven ineffective, Plaintiff had a large piece of concrete that he could use as a weapon, he had ignored several direct orders, and he obstructed any view of the activities in his cell. Ex. E ¶ 36 & Attach. at 1, § 1 and 6, § 6.

46. The destruction of an inmate's cell, coupled with noncompliance with direct orders, is a common precursor to a calculated use of force. Ex. E ¶ 37.

47. The calculated use of force was carried out in accordance with Bureau policy and standard Bureau practices and procedures. Ex. E ¶ 39 (providing examples) & ¶ 42 (explaining that only minor errors were observed); *see also* Ex. F ¶ 15.

48. Nothing about Plaintiff's mental-health status or his requests to see his mental-health provider before the calculated use of force undermined the appropriateness of the Bureau's decision to use force to regain control of Plaintiff. Ex. E ¶ 38.

49. The decision to use restraints on Plaintiff—both hard restraints during the use of force and hard ambulatory restraints for a short period immediately after the use of force—was an exercise of sound correctional judgment and in accordance with Bureau policy given the severity of Plaintiff's cell destruction, his refusal to submit to hand restraints until after two rounds of OC munitions, his known history of defeating restraints and destroying Bureau property, and his continued disruptive conduct during the use of force. Ex. E ¶ 40.

9

50. Plaintiff's restraints were checked, monitored, and documented in accordance with Bureau policy. Ex. E ¶ 41, Attach. C at 24:30-24:45 & 32:05-32:36, Attach. H, Attach. I at 8, § 6(j) and 18-19, §14(b).

51. Consistent with Bureau policy, Plaintiff was taken out of hard ambulatory restraints once he demonstrated a pattern of self-control. Ex. E ¶ 41 & Attach. I at 7, § 6(f) and 11, § 9.

### *Bureau staff have discretion to house disruptive inmates on Range 13.*

52. Bureau staff are responsible for maintaining a safe and secure institution, and housing assignments are a critical tool for achieving that end. Ex. D ¶ 14.

53. The decision to place an inmate on Range 13 is a housing-classification decision that falls within the sound correctional judgment of the Warden, who consults with a variety of different individuals within the institution. Ex. D ¶¶ 17-18.

54. Bureau staff exercise sound correctional judgment in assessing whether a particular inmate needs the increased level of individualized control available on Range 13, and will weigh a variety of factors, including: (i) the nature and severity of the inmate's present behavior; (ii) whether there is a specific need to place the inmate on Range 13 because of its unique control features; (iii) the availability of cells outside of Range 13 that would be appropriate for this particular inmate; (iv) the inmate's disciplinary history; and (v) the availability of Bureau staff and resources to help control the inmate if his disruptive behavior continues. Ex. D ¶¶ 17-19.

55. No statute or federal regulation, Program Statement, Institutional Supplement, or Operations Memorandum prohibits Bureau staff from housing an inmate on Range 13 as a control measure after an inmate destroys his cell, refuses direct orders, and is placed under control by a calculated use of force. Ex. D ¶ 20.

56. No Bureau Program Statement or Settlement Agreement relating to the treatment of inmates with mental illness proscribed Bureau officials from housing Plaintiff on Range 13 from April 14 to April 18, 2017, in these circumstances. Ex. D ¶ 20; Ex. F ¶ 19.

57. There is nothing about an inmate's need for mental-health services that precludes his placement on Range 13 as a safety measure. Ex. F ¶ 20.

***Bureau staff acted appropriately in temporarily housing Plaintiff on Range 13.***

58. Bureau staff acted appropriately and consistent with standard Bureau practice in placing Plaintiff on Range 13 between April 14, 2017, and April 18, 2017. Ex. D ¶ 21.

59. It was an exercise of sound correctional judgment to temporarily place Plaintiff in Cell 40 on Range 13 in light of: (i) the severity of his conduct leading up to the calculated use of force, including destroying parts of his concrete bed, breaking his outer cell door window, and ignoring several direct orders; (ii) the nature and extent of his disciplinary history, including his history of destroying property, defeating restraints, and assaulting correctional officers and police officers; and (iii) the timing of his cell destruction, which took place on a Friday afternoon when the facility was transitioning to its leaner weekend staff coverage. Ex. D ¶¶ 22-25.

60. It is common practice to place an inmate in Cell 40 on Range 13 as a control measure after he has destroyed components of his cell. Ex. D ¶ 27; *see also* Ex. F ¶ 20.

61. Given the severity of Plaintiff's conduct leading up to his placement on Range 13 and his history of violence, it was appropriate for Bureau staff to monitor his behavior for four days before concluding that he could safely return to a less restrictive environment. Ex. D ¶ 28.

62. Further, the four days Plaintiff spent on Range 13 was an appropriate amount of time for Bureau staff to assess and arrange for a less restrictive housing option. Ex. D ¶ 28.

11

## ARGUMENT

### I.   Plaintiff's claim under the Medication Theory fails.

Plaintiff's claim fails under the Medication-Discontinuation Theory, *see* ECF No. 64 at 10, ¶ 6, because Plaintiff has not identified any discontinuation of medication or failure to provide medication from 2017.

Ten months ago, on November 4, 2021, the Court limited Plaintiff's Medication-Discontinuation Theory to discontinuations in 2017. ECF No. 108 at 18. Specifically, the Court found that the "part of plaintiff's IIED claim" based on "medication discontinuations *in 2017*. . . should proceed." *Id.* (emphasis added). In reaching this conclusion, the Court distinguished allegations about medication-related conduct that occurred in 2017—which Plaintiff did timely raise—from allegations about conduct before 2017—which Plaintiff did *not* timely raise.[1] Four months later, the Court again clarified that this portion of Plaintiff's claim is limited to any allegedly improper "discontinuation or failure to provide medication while Plaintiff was in the ADX facility [in Florence, Colorado] *in 2017*." ECF No. 143 (emphasis added).

Plaintiff has not identified any instance where his medications were improperly discontinued or not provided to him in 2017. After the Court initially limited Plaintiff's claim, ECF No. 108, discovery remained open for more than nine months, ECF No 134 (setting August 24, 2021 discovery cutoff). During that time, Plaintiff had every opportunity to raise concerns about

---

[1] ECF No. 108 at 3-4 (describing Plaintiff's administrative tort claims), 8-9 (dismissing four of those administrative claims as untimely), 17-18 (rejecting Defendant's assumption that alleged instances of medication discontinuations raised in the second amended complaint necessarily were the same as the instances raised in Plaintiff's untimely administrative claims and concluding "[i]t is equally reasonable to assume that plaintiff's references to medication discontinuations *in 2017* . . . encompass different incidents," such that "*this part of* plaintiff's IIED claim should proceed" (emphasis added)).

12

his medications. Indeed, he articulated several specific concerns he has about medication discontinuations that occurred in 2015 and 2016. SOF ¶ 1. But he did not identify discontinuations or failures to provide medication in 2017. SOF ¶ 2.

Because Plaintiff's claim is limited to 2017 but he has not identified any discontinuations or failures to provide medication in that timeframe, there is no evidence to support his claim. The claim fails.

## II. Plaintiff's claim under the Use-of-Force Theory fails.

Plaintiff's claim under the Use-of-Force Theory fails for two reasons. First, his challenges to Bureau decisions related to the use of force are barred by the FTCA's discretionary-function exception. Second, even if the claim were not barred, it would fail on the merits.

### A. The claim is barred by the discretionary-function exception.

The United States enjoys sovereign immunity from suit, absent a congressional waiver of that immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Congress has enacted a waiver of immunity through the FTCA, allowing the United States, in certain circumstances, to be held liable for negligent or wrongful acts of its employees. *See* 28 U.S.C. § 1346(b)(1).

But that waiver is limited. In the discretionary-function exception, Congress declined to waive the United States' sovereign immunity for claims challenging an action or omission where a federal agency had discretion to make a decision based on public policy. The exception bars any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not

13

the discretion involved be abused." 28 U.S.C. § 2680(a).[2]

In *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), the Supreme Court established a two-prong test for evaluating the applicability of this exception. First, the court considers whether the precise conduct at issue "was 'discretionary,' meaning whether it was 'a matter of judgment or choice.'" *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (quoting *Berkovitz*, 486 U.S. at 536). "Conduct is not discretionary if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536). If the conduct at issue is discretionary, the court turns to the second prong, where it considers whether the challenged action or decision "is one requiring the exercise of judgment based on considerations of public policy." *Id.* (citing *Berkovitz*, 486 U.S. at 536-37).

The undisputed facts show that Plaintiff's claim under the Use-of-Force Theory satisfies both prongs. At bottom, that theory appears to challenge three Bureau decisions related to the April 14, 2017 calculated use of force: (1) the decision to use force after Plaintiff broke a large piece from the corner of his concrete bed and used it to break the window on his outer cell door; (2) the decision to use hard restraints during the use of force and then hard ambulatory restraints for the two hours Plaintiff was in a holding cell immediately after the use of force; and (3) the decision to temporarily place Plaintiff on Range 13, a more restrictive range, for four days after the use of force. *See* ECF No. 64 at 10, ¶ 9. But such decisions are left to the sound discretion of Bureau staff and involve important policy judgments about how to best ensure safety and security

---

[2] Claims that fall within the exception are barred regardless of whether the challenged conduct "was a matter of deliberate choice or mere oversight," *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993), and even if there was negligence, *Elder v. United States*, 312 F.3d 1172, 1184 (10th Cir. 2002).

14

at a prison that houses the most dangerous inmates in Bureau custody. Accordingly, Plaintiff cannot meet his burden to prove the discretionary-function exception does not apply, and his claim is barred. *See Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005) (a plaintiff bears the burden of establishing subject-matter jurisdiction).

### *The challenged conduct is discretionary.*

Under the first prong of the discretionary-function test, a plaintiff bears the burden "to present evidence of a discretion-constraining regulation or policy." *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008). Generic references to discretion-constraining laws are not enough—a plaintiff must cite a *particular* mandatory federal statute, regulation, or policy that the government allegedly violated. *See Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1539 (10th Cir. 1992). "The first prong is met if the Court determines there was not a federal statute, regulation, or policy in place that *specifically mandated a particular course of action.*" *Steele v. United States*, No. 09-cv-01557-CMA-CBS, 2010 WL 2501200, at *3 (D. Colo. June 15, 2010) (emphasis added) (citing *Berkovitz*, 486 U.S. at 536). To find that a statute, regulation, or policy required particular action, "there must be some 'fixed standard' for government employees to follow." *Id.* (quoting *Flynn v. United States*, 902 F.2d 1524, 1531 (10th Cir. 1990)).

Here, Plaintiff's Use-of-Force Theory is premised on the idea that Bureau staff acted improperly by using force and restraints on him on April 14, 2017, and by temporarily placing him on Range 13 from April 14 to April 18, 2017. But Plaintiff cites no statute, regulation, or policy that prohibited Bureau staff from using force to remove him from his cell, or from temporarily placing him in a more restrictive housing area, in response to him destroying his concrete bed, breaking the window of his outer cell door, and refusing multiple direct orders. SOF ¶¶ 12-20, 32-

15

34. Nor does he cite any statute, regulation, or policy that prohibited Bureau staff from using restraints on Plaintiff—who continued to be disruptive during the use of force and who had a known history of defeating restraints and destroying Bureau property—during the use of force and for a short period afterward. SOF ¶¶ 6-7, 21, 24-26. And none do. SOF ¶¶ 42-43, 55-57.

Because Plaintiff cannot meet his burden of identifying "a specific and mandatory regulation, statute or policy [that] requires a particular course of action" in how Bureau staff responded to Plaintiff's disruptive and dangerous conduct on April 14, 2017, *see Daigle*, 972 F.2d at 1538, the first prong of the test is satisfied.

### *The challenged conduct is susceptible to policy analysis.*

Under the second prong, Plaintiff cannot show the Bureau's conduct could not require "the exercise of judgment based on considerations of public policy." *Garcia*, 533 F.3d at 1176. "In determining whether the second prong is met, courts have applied an expansive view of the policy considerations underlying the discretionary decisions." *Steele*, 2010 WL 2501200, at *3. This is particularly true in the prison context, where "Supreme Court precedent cautions courts to afford prison officials deference in reviewing their decisions." *Id.* (collecting cases); *see also id.* ("Decisions by prison officials are generally 'of the kind that the discretionary function exception was designed to shield'" (quoting *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991))).

Bureau officials are responsible for maintaining institutional security and ensuring the safety of inmates, Bureau staff, and the public. *See, e.g.*, 18 U.S.C. § 4042(a)(2). This responsibility is particularly serious at the ADX—the most secure prison in the federal system with the most dangerous inmates. SOF ¶¶ 3-4. Decisions Bureau staff make in responding to disruptive ADX inmates, like Plaintiff, reflect important policy judgments about the most effective means of

maintaining institutional security. For example, when deciding whether a calculated use of force is necessary to bring an inmate under control, Bureau staff weigh a variety of factors, including the severity of the inmate's conduct, the inmate's medical and disciplinary history, and the availability of Bureau staff and resources. SOF ¶¶ 35-38. Bureau staff also consider several factors in determining whether it is necessary to use restraints on a disruptive inmate, including the severity of the inmate's conduct, whether the inmate has defeated restraints in the past, the inmate's history of violence or assault, and whether the inmate presently has self-control. SOF ¶¶ 39-41. Similarly, Bureau staff balance multiple factors in deciding whether to move a disruptive inmate to a more restrictive housing option, including the severity of the inmate's conduct, whether there is a specific need to place him on Range 13 because of its unique control features, the availability of appropriate cells outside of Range 13, the inmate's disciplinary history, and the availability of Bureau staff to help control the inmate if his disruptive behavior continues. SOF ¶¶ 52-54.

Such decisions are susceptible to fundamental policy-related judgments regarding prison safety and security that a court should not second guess. *See McKreith v. United States*, No. 1:19-cv-106, 2020 WL 5513415, at *3-4 (N.D.W. Va. Sept. 14, 2020) (discretionary-function exception applied because Bureau staff's use of force and restraints "involved an element of judgment or choice in deciding how to respond to [p]laintiff's behavior" that was "based in public policy"); *Steele*, 2010 WL 2501200, at *6 (exception applied because the challenged judgment "involve[d] policy considerations relating to prison security, a matter better left to the discretion of prison officials"). Thus, the second prong of the test also is met.

### B. The claim would fail on the merits.

Even if Plaintiff's claim based on the Use-of-Force Theory were not barred by the

discretionary-function exception, it would fail on the merits.

To establish an IIED claim, Plaintiff must show, among other things, that Defendant engaged in "extreme and outrageous conduct." *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994). Such conduct "goes 'beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Riske v. King Soopers*, 366 F.3d 1085, 1089 (10th Cir. 2004) (quoting *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970)). "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Culpepper*, 877 P.2d at 883. Where the challenged conduct "cannot be considered as rising to the egregious standard required, a claim for outrageous conduct is properly dismissed." *Shackelford v. Courtesy Ford, Inc.*, 96 F. Supp. 2d 1140, 1146 (D. Colo. 2000).

Here, Plaintiff contends that Defendant engaged in extreme and outrageous conduct in connection with the April 14, 2017 calculated use of force and his subsequent placement on Range 13. *See* ECF No. 64 at 10, ¶ 9. But the undisputed facts show that no Bureau staff engaged in conduct that was beyond the bounds of decency, atrocious, and utterly intolerable. *Riske*, 366 F. 3d at 1089.

Specifically, the undisputed facts show that Bureau staff acted appropriately in deciding to perform the calculated use of force and in carrying it out, including placing Plaintiff in restraints. Plaintiff had refused multiple direct orders, broke off a piece of his concrete bed, broken the window of his outer cell door, obstructed the view inside of his cell, and declined to participate in confrontation avoidance. SOF ¶¶ 12-20. Considering the undisputed severity and dangerousness of Plaintiff's conduct, along with his known history of defeating restraints and destroying property,

18

SOF ¶¶ 6-7, it was an exercise of sound correctional judgment and consistent with Bureau policy and practice to use force to regain control of Plaintiff and to use restraints until Plaintiff demonstrated a pattern of self-control. SOF ¶¶ 44-51.

Further, the undisputed facts show that Bureau staff acted properly by temporarily placing Plaintiff on Range 13, where he could be constantly monitored and housed in a fully hardened cell that is much more difficult to destroy. SOF ¶¶ 27-31. Plaintiff had just finished severely damaging his assigned cell, and he was so committed to his disruptive conduct that he submitted to hand restraints only after two rounds of OC munitions. SOF ¶¶ 12-20. Further, Plaintiff had a known history of assaulting correctional officers and police officers, defeating restraints, and destroying Bureau property. SOF ¶¶ 6-7. Given these undisputed circumstances, it was an exercise of sound correctional judgment and consistent with Bureau practice to use the extra control measures available on Range 13 to monitor his behavior for four days before concluding that he could safely return to a less restrictive environment. SOF ¶¶ 58-62.

Because the undisputed facts show that Bureau staff exercised sound correctional judgment and acted consistent with Bureau policy and standard practice, Plaintiff cannot meet his burden to show that Defendant engaged in extreme and outrageous conduct. *See Nasious v. Two Unknown B.I.C.E. Agents at Arapahoe Cty. Just. Ctr.*, 657 F. Supp. 2d 1218, 1232 (D. Colo. 2009) (granting summary judgment for defendant because "no reasonable man could make a finding of outrageous conduct" where the undisputed facts showed "Defendant simply followed standard procedures"). The Court should enter summary judgment in Defendant's favor.

## CONCLUSION

The Court should enter judgment in favor of Defendant on Plaintiff's lone remaining claim.

Respectfully submitted September 23, 2021.

          MATTHEW T. KIRSCH
          Acting United States Attorney

          *s/ Laura J. Ellis*
          **Laura J. Ellis**
          Logan Steiner
          Assistant United States Attorneys
          U.S. Attorney's Office
          1801 California Street, Suite 1600
          Denver, CO 80202
          Telephone: (303) 454-0100
          Email: Laura.Ellis@usdoj.gov
          Attorneys for Defendant

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on September 23, 2021, I mailed the foregoing document to the following non CM/ECF participant:

Alphonso Blake, Jr., #08083-007
Pollock High
U.S. Penitentiary
Inmate Mail/Parcels
P.O. Box 2099, Pollock, LA 71467

          *s/ Laura J. Ellis*
          U.S. Attorney's Office