IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00570-RBJ-SKC

ALPHONSO BLAKE, JR.,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

## DECLARATION OF ADAM SAPP

I, Adam Sapp, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above-titled matter:

1. I am a Captain and the Chief of Correctional Services at the United States Department of Justice, Federal Bureau of Prisons (Bureau) facility known as the Federal Correctional Institution (FCI) in Englewood, Colorado. I have been employed in this capacity since October 2019. Before that, from June 2016 to October 2019, I was a Lieutenant at the Federal Correctional Complex (FCC) in Florence, Colorado. The FCC encompasses several different facilities, including the United States Penitentiary Administrative Maximum (ADX). I was assigned to the ADX for two-and-a-half of the three years I spent at the FCC. I have been employed by the Bureau in other prisons, in positions of increasing responsibility, since 2001.

2. In my employment, I have access to records maintained in the ordinary course of

business by the Bureau, including information maintained in the SENTRY database,[1] inmate central files, official Bureau policies, and records related to calculated uses of force that are carried out by Bureau staff. All attachments to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

3.      In my current role as a Captain at the FCI in Englewood, I am responsible for the Supervision of the Correctional Services Department. This includes 13 Lieutenants, two Security Officers and 115 Correctional Officers. I'm responsible for supervising all these staff and ensuring the safety of all staff and inmates through enforcement of all policies to include: Use of Force, Visiting Procedures, Count Procedures, Security Procedures, Housing Assignment Procedures, and many other facets of day-to-day operations. When an inmate is disruptive, I personally evaluate the inmate's housing assignment and make determinations regarding whether the inmate should be in a more secure housing environment. When making housing assignment determinations, I consider the inmate's prior discipline, current behavior, compliance with staff orders, and respectfulness toward staff.

4.      As a Lieutenant at the ADX, I was responsible for staff supervision as a Shift Supervisor. I provided supervisory oversight for daily operations and dealt with issues as they arose. These duties included making the decision about where to house an inmate immediately following a calculated use of force and then making recommendations to the Captain and the Warden about whether to continue with that specific housing assignment. My housing

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

assignment decisions and recommendations were based on my correctional judgment, taking into consideration various factors. Those factors included, but were not limited to, the inmate's compliance with staff orders and disciplinary history, whether the inmate could be safely returned to his assigned cell after the calculated use of force, and whether housing the inmate in the same location was warranted based on the behavior of other inmates housed near to the inmate whose non-compliant behavior prompted the calculated use of force.

5. Further, having worked for the Bureau for more than two decades, I have extensive training and experience in effectively addressing and preventing inmate behavioral issues. I have dealt with numerous disruptive inmates and have extensive experience in evaluating inmate behavior from a correctional management standpoint, to best manage violent and disruptive inmates.

***ADX inmates pose a unique and serious security risk.***

6. The ADX is the most secure prison in the federal system. The inmates housed at the ADX have an uncommon level of security due their serious records of institutional misconduct, involvement in violent or escape-related behavior, and/or unusual security needs based on the nature of their offense. Inmates are designated to the ADX because they are unable to function in an open population setting. Accordingly, appropriate housing assignments are critical to controlling inmates housed at the ADX and to ensuring the safety of staff, inmates, and members of the public.

7. The primary reasons for transferring an inmate to the ADX are murder/attempted murder of an inmate, assaulting inmates, assaulting staff, a demonstrated need for greater security and increased monitoring, escape behavior, direct court commitment, and rioting. Other,

less frequent reasons for transfer to the ADX are attempted murder of staff, taking staff hostage, participation as a leader in a work and/or food strike, introduction of narcotics into the institution, and gang leadership. Of all Bureau inmates, ADX inmates present the greatest risk of violence to staff, other inmates, and visitors, and they are extreme escape risks.

8. The security needs of the inmates housed at the ADX require very restrictive procedures for moving the inmates and for their interactions with Bureau staff and other inmates, recreation, visitation, and programming.

***Plaintiff's temporary placement on Range 13.***

9. I have an understanding of the claims and allegations in the above-captioned lawsuit. I understand that Plaintiff—a former inmate at the ADX named Alphonso Blake, Jr.[2]—claims Bureau staff intentionally caused him emotional distress by placing him on Range 13 after an April 14, 2017 calculated use of force.

10. At approximately 5:15 PM on Friday, April 14, 2017—after a calculated use of force and after Plaintiff had demonstrated a pattern of self-control—Plaintiff was transported from G Unit to Range 13 in C Unit. Ex. E (Dodge Decl.)[3] at Attach. H (Use of Restraints Forms) at 1; Attach. A (Excerpt Inmate History Quarters).

11. At approximately 5:35 PM that same day, Plaintiff was placed in Cell 40 on Range 13. Attach. A.

---

[2] Plaintiff was housed at the ADX from February 2011 to March 2019. Although Plaintiff was at the ADX during my tenure there, I do not recall having any direct contact with him. Further, I was not involved in the decision to employ the calculated use of force procedure on April 14, 2017 or the decision to temporarily place Plaintiff on Range 13.

[3] I have reviewed the materials attached to Assistant Warden Dodge's Declaration. My analysis is based on many of the same underlying videos and documents. Rather than reattach those materials, I cite to the attachments in his declaration when appropriate.

12. Cell 40 is the only fully "hardened" cell on Range 13 and in the ADX more generally. Unlike other cells at the ADX, which have concrete walls, beds, stools, desks, and shelves, Cell 40 has steel plate walls and ceiling, a steel bed, a steel re-bar reinforced stool and desk, and a steel shelf, which are much more difficult to destroy.

13. Plaintiff remained in Cell 40 on Range 13 until approximately 2:00 PM on Tuesday, April 18, 2017. At that point, Plaintiff was moved off of Range 13 and placed in Cell 106 in C Unit. Attach. A.

***Bureau staff have discretion to house inmates on Range 13.***

14. Bureau staff are responsible for maintaining a safe and secure institution. Housing assignments are a critical tool for controlling inmate behavior and for maintaining a safe and secure environment. For example, Bureau staff can reduce opportunities for inmate disruption by placing inmates who are likely to have conflict (e.g., inmates from rival Security Threat Groups and Disruptive Groups) in cells located in separate units or ranges. Similarly, strategic housing assignments can reduce the likelihood of disruptive conduct by separating inmates who are likely to encourage or instigate undesirable behavior or to conspire in committing misconduct if they are allowed to communicate.

15. In 2017, the ADX was using all of the nine available units (B, C, D, E, F, G, H, J, K) to house inmates and it operated five distinct programs (the General Population and Step-Down Program, the Release Preparation Program, the High Security Adult Alternative Housing Program, the Control Unit Program, and the Special Security Unit Program). Below is a brief description of the five programs and the housing units where they were located in 2017:[4]

---

[4] The five programs described here remain in effect, although fewer units are being used today.

a. **The four General Population Units** (D, E, F, and G Units): housed those inmates in the first of the four-step Step-Down Unit Program.

b. **The Intermediate Unit** (J Unit, Range A) housed those inmates in the second step of the Step-Down Program. Inmates in the third and fourth steps of the program are housed in a different facility at the FCC.

c. **The Release Preparation Program Unit** (K Unit, Range A): housed those inmates who demonstrated that they could function in a less restrictive environment within the ADX, but who may still be unable to complete the Step-Down Program prior to their release.

d. **The High Security Adult Alternative Placement Program** (K Unit, Range B) housed those inmates who demonstrated that they could function in a less restrictive unit within the ADX, but whose safety needs prevented them from advancing through the ADX Step-Down Program.

e. **The Control Unit** (B Unit and C Unit, Ranges A & B): housed the most dangerous, predatory, violent, disruptive and assaultive inmates in the Bureau's custody. The Control Unit provided housing for inmates who were unable to function in a less restrictive environment without posing a threat to others or to the institution. This unit typically housed inmates who had assaulted or killed staff or other inmates or who had escaped or attempted escape from another institution. Referral to this unit is outlined in Program Statement 5212.07, *Control Unit Programs*.

f. **The Special Housing Unit** (C Unit, Range 1): short-term housing unit for inmates in Disciplinary Segregation who have been found guilty of prohibited acts while at the ADX.

g. **The Special Security Unit** (H Unit): housed those inmates with Special Administrative Measures imposed on them, pursuant to 28 C.F.R. §§ 501.2 and 501.3.

16. Range 13 is a separate housing area that is physically located within C Unit. Both in 2017 and today, Range 13 is used to house General Population and Control Unit inmates who have demonstrated the need for an increased level of individualized control. Range 13 is comprised of four, single-occupancy cells (Cell 10, Cell 20, Cell 30, and Cell 40). The cells on Range 13 contain a shower, toilet, bunk, desk, and television, similar to cells in the General

6

Population Units and in the Control Unit. However, Range 13 is unique in several ways:

- First, as explained above, Range 13 has the only fully hardened cell (Cell 40) in the ADX, which prevents inmates from destroying that cell.
- Second, each Range 13 cell has an interior camera, which is located inside the cell sallyport and which monitors the inmate's living space and the sallyport area of the cell.
- Third, the physical layout of Range 13 is designed to allow the inmate to move from his cell to other programming areas with minimal contact with staff and other inmates, which ensures the safety of staff and other inmates and the orderly running of the institution. Specifically, an inmate housed on Range 13 is permitted to move to an individual (single-user) outdoor recreation area and an individual law library directly from his assigned cell, and an indoor recreation area is accessible from two Range 13 cells (it can only be used by one inmate at a time). As a result, a Range 13 inmate can participate in recreation and use the law library without the need for a staff escort. (Inmates housed on Range 13 are afforded the same individual recreational opportunities as all other ADX inmates and, like other ADX inmates, they have access to programming opportunities commensurate with their individual needs and status.)

17. The decision to place an inmate on Range 13 is a housing classification decision that falls within the sound correctional judgment of the Warden and that is based on the particular inmate's need for the increased level of individualized control available on Range 13.

18. In my experience, the decision to place an inmate on Range 13 after a calculated

use of force is typically made by the Warden, following a recommendation by, and consultation with, the Operations Lieutenant on shift at the time of the incident, the Captain, Psychology, Health Services, and/or the Lieutenant who oversaw the calculated use of force. The Warden exercises his or her sound correctional judgment to determine whether a particular inmate should be placed on Range 13. There are no Program Statements, Institutional Supplements, or Operations Memorandums (either today or in 2017) concerning Range 13 and the placement of inmates on there. Further, there is no requirement (either today or in 2017) that placements on Range 13 be approved by the Regional Office. Each placement on Range 13 requires an individualized assessment by the Warden, following a recommendation by, and/or consultation with other institution staff that the greater individualized control available on Range 13 is needed to ensure the safety of the inmate, Bureau staff, and/or the broader inmate population. The inmate's continued placement on, or assignment to, Range 13 is then reviewed each week by the Warden, consulting with the Associate Wardens, the Captain, Psychology, Health Services, and members of the inmate's Unit Team.

   19. A corrections professional, exercising sound correctional judgement, will weigh a variety of factors in deciding to place an inmate on Range 13, including but not limited to (i) the nature and severity of the inmate's present behavior (e.g., how disruptive the inmate is being, how much effort was required to regain the inmate's compliance with lawful orders, whether the inmate was threatening violence, the immediacy of the risk posed by the inmate's behavior, etc.); (ii) whether there is a specific need to place the inmate on Range 13 because of its unique control features (e.g., is it necessary to have constant video monitoring of an inmate, to place the inmate in a fully hardened cell, or to separate the inmate from other inmates); (iii) the availability of

cells outside of Range 13 that would be appropriate for this particular inmate (e.g., placement on Range 13 may be necessary for the simple reason that other open cells are located near inmates that the particular inmate has a history of conflict with or who would encourage or attempt to exacerbate the inmate's disruptive behavior); (iv) the inmate's disciplinary history (e.g., the nature and severity of past conduct, how the inmate has responded to past discipline, whether the inmate has a specific history of violence or of destroying their cell, etc.); and (v) the availability of Bureau staff and resources to help control the inmate if his disruptive behavior continues (e.g., the additional control measures on Range 13 may be necessary if the disruptive conduct occurs in the evening or on a weekend, when staff and resources are more limited).

20. I am aware of no statute or federal regulation, Program Statement, Institutional Supplement, or Operations Memorandum that prohibits Bureau staff from housing an inmate Range 13 as a control measure after an inmate destroys his cell, refuses direct orders, and is placed under control by a calculated use of force. Further, I am aware of no Bureau Program Statement or Settlement Agreement relating to the care and treatment of inmates with mental illness that that would have proscribed Bureau officials from housing Plaintiff on Range 13 from April 14 to April 18, 2017, in these circumstances.

***Bureau staff acted appropriately in housing Plaintiff on Range 13.***

21. In the course of this litigation, I reviewed the videos and documentation that were created as part of the April 14, 2017 calculated use of force against Plaintiff. I also reviewed documentation related to Plaintiff's housing and disciplinary history. Based on my independent review of those materials, and my specialized knowledge of prison security and my experience making housing decisions, Bureau staff acted appropriately and consistent with standard Bureau

9

practice in deciding to place Plaintiff on Range 13 between April 14, 2017, and April 18, 2017, following Plaintiff's destruction of his cell and the calculated use of force.

22. The decision to house Plaintiff on Range 13 as a control measure was an exercise of sound correctional judgment for several reasons.

23. First, Plaintiff's conduct leading up to and during the calculated use of force was sufficiently severe to necessitate the additional control measures available on Range 13. Plaintiff had destroyed the corner of his cement bed and smashed his thick-paned, outer cell door window using a chunk of concrete, which created a serious safety risk to Plaintiff and Bureau staff. Dodge Decl. Attach. E (Photographs of Cell Destruction). Placement in Cell 40 on Range 13 made sense given this conduct, because placement in other, not-fully-hardened cells would have allowed Plaintiff to resume the same destructive conduct. Further, Plaintiff had ignored several direct orders from various Bureau staff, he had not responded to confrontation avoidance, and he had only submitted to hand restraints after two rounds of oleoresin capsicum ("OC") munitions. Dodge Decl. Attach. C (Use of Force Video 1) at 08:04–13:10. OC munitions are very unpleasant. By choosing to undergo two rounds of OC munitions instead of submitting to hand restraints, Plaintiff signaled that he possessed a serious commitment to his disruptive behavior.[5] Given his commitment, placement on Range 13 was appropriate and consistent with standard practice because it allowed Bureau staff to closely monitor Plaintiff after the calculated use of force—through constant video monitoring—to ensure that he had fully calmed down and regained his composure before placing him back in a cell like the one he had just destroyed.

---

[5] That commitment was also seen in Plaintiff's verbal narrations and use of profanity during the calculated use of force, both of which are a continued form of noncompliance. *See, e.g.*, Dodge Decl. Attach. C at 19:25-20:30, 30:50-31:20.

10

Placement on Range 13 also gave Plaintiff a cooling off period where he was physically separated from other inmates and therefore free from the potential that other inmates would attempt to reaggravate him or encourage him to continue acting out.

24.     Second, Plaintiff's disciplinary history supported his placement on Range 13 after the calculated use of force. Plaintiff had a known history of destroying Bureau property (he had done so less than 11 months before the April 14, 2017 incident), defeating restraints, and assaulting correctional officers and police officers. This history was specifically noted in the video footage taken before the calculated use of force. Dodge Decl. Attach. C at 1:25-1:35; *see also* Dodge Decl. Attach. D (Disciplinary Records) at 2-4; Attach. B (Inmate Profile) at 2. Given the seriousness of Plaintiff's past disruptive conduct and the security risks posed by such conduct, it was appropriate and consistent with standard practice for Bureau staff to place Plaintiff on Range 13 after he had destroyed his cell and refused direct orders. This allowed Bureau staff to safely monitor Plaintiff's behavior until they were confident he had regained self-control and that he was not at immediate risk of further disruptive conduct.

25.     Third, the timing of Plaintiff's disruptive conduct supported his placement on Range 13. The calculated use of force was completed at approximately 3:15 PM on April 14, 2017—a Friday afternoon—and Plaintiff was then placed in a holding cell in G Unit until he regained self-control at approximately 5:15 PM. Attach. A. By that time, the shift change had already occurred, and the weekday Bureau staff had gone home for the weekend and the facility was transitioning to its leaner weekend staff coverage. In other words, by the time Plaintiff had calmed down enough to be transported out of G Unit, the ADX had far fewer staff available to manage his behavior than are available during the regular workweek. Further, consistent with

leaner weekend staff, no maintenance services (other than heating or cooling repairs) would have been available until Monday morning, meaning no one could begin repairing the damage Plaintiff had done to his assigned cell. Given these limitations on staff and resources, it was appropriate and consistent with standard practice to place Plaintiff on Range 13, where other inmates could not provoke him and where the more limited number of Bureau staff had greater ability to control Plaintiff, should he resume his disruptive conduct over the weekend.

26.     Neither Plaintiff's mental health status nor his requests to see his mental health provider before the calculated use of force, Ex. F (Dr. Kimble Decl.) ¶¶ 7-12, undermine the appropriateness of the Bureau's decision to place him on Range 13 as a control measure from April 14, 2017, to April 18, 2017.

27.     Further, nothing about the decision to place Plaintiff on Range 13 was atypical or unusual. In my experience, the destruction of concrete components of a cell is a common precursor an inmate's placement in Cell 40 on Range 13 for a period of time. This is so because Cell 40 is uniquely designed to prevent cell destruction, and once an inmate has destroyed his assigned cell, it makes little sense to put him in a cell that is vulnerable to the exact same destructive behavior. Placement in Cell 40 is therefore a desirable behavioral management tool and an accepted Bureau practice because it allows Bureau staff to move the inmate to a secure location while his cell is being repaired, without having to worry that the recently disruptive inmate will destroy yet another cell before he calms down. During my two-and-a-half years at the ADX, I was aware of at least 10-to-15 instances when an inmate was temporarily placed in Cell 40 as a control measure after the inmate destroyed concrete components of his assigned cell.

28.     The length of Plaintiff's placement on Range 13—from 5:35 PM on Friday,

April 14, 2017, until 2:00 PM on Tuesday, April 18, 2017—also was appropriate and consistent with standard practice. There is no indication in Plaintiff's disciplinary record that he continued to engage in disruptive conduct once he was placed on Range 13.[6] Although Plaintiff's behavior apparently improved, given the severity of his conduct leading up to placement on Range 13 and his history of violence, four days was an appropriate period for Bureau staff to monitor his behavior before concluding that he had in fact fully regained self-control and could safely return to a less restrictive environment. Further, four days was an appropriate amount of time for Bureau staff to assess and arrange for another housing option, especially given that two of those days were weekend days with limited staff and resources. Facilities Maintenance Staff would have returned to work on Monday morning and started repairs as soon as they were able to.

---

[6] Although Range 13 inmates are constantly monitored by video, there is no video footage of Plaintiff on Range 13 from April 14 to April 18. Unless the Bureau has a specific reason to preserve video footage, it is overwritten after approximately six months. Further, placement on Range 13 does not require Bureau staff to generate additional or special documents compared to placement on other ranges at the ADX.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on this 20th day of September 2021, in Englewood, Colorado.

<u>s/ Adam Sapp</u>
Adam Sapp
Captain
Federal Bureau of Prisons
Englewood, Colorado

**Enclosures**

Attach. A –   Excerpt Inmate History Quarters
Attach. B –   Inmate Profile